COURT OF
APPEALS

                                                   EIGHTH DISTRICT OF
TEXAS

                                                              EL
PASO, TEXAS

 


 
 
  
  
 ROBERTO VALDEZ,
  
                                    
 Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                                     Appellee.
 
  
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
  
 '
 
 
  
  
                   No. 08-10-00331-CR
  
                          Appeal from
  
 171st District
 Court
  
 of El Paso County,
 Texas
  
 (TC # 20080D04281)
  
 
 
 
 
  
  
 
 
  
  
 
 
  
  
 
 


 

                                                                  O
P I N I O N

 

 

            Roberto Valdez appeals his
convictions of capital murder (Count I) and aggravated assault (Count II).  A jury found Appellant guilty of both
offenses and further found that he used or exhibited a deadly weapon during the
commission of the aggravated assault offense. 
The trial court assessed Appellant’s punishment at life imprisonment on
Count I and imprisonment for fifteen years on Count II.  The trial court included an affirmative
deadly weapon finding in the judgment related to Count II.  For the reasons that follow, we affirm.

FACTUAL SUMMARY

            In June of 2008, twenty-year-old Ana
Sarahi Hernandez (“Sarahi”) was dating Jorge Cardenas.  On Saturday, June 14, Sarahi attended a
family get-together at his house.  Sometime
during the evening, Sarahi became jealous and got into an argument with Jorge because
he had received a text message from a female friend inviting him to go
somewhere with her.  Sarahi got into her
vehicle and left the party.  

            Sarahi’s fourteen-year-old sister,
Crystal Nesbitt, was waiting for Sarahi to return home from the party so that
they could watch a movie together.  At
approximately midnight, Crystal saw the headlights of Sarahi’s car outside, but
Sarahi just left her car at the house and never came inside.  She also heard a second vehicle which she
recognized as Appellant’s car.  She was
familiar with the sound of his car because Appellant had been to the house
before to visit Sarahi.  Sometime
thereafter, Crystal fell asleep.  

            Sarahi telephoned Jorge several
times between 2 and 3 a.m. and they continued to argue.  In the final call which ended around 3 a.m.,
he convinced her to return to his parent’s house because the party had not
ended.  He understood from their final
conversation that Appellant was going to bring Sarahi back to the party but she
never returned.  Jorge knew that Sarahi
and Appellant were friends.  Jorge called
Sarahi’s home at around 4 a.m., but no one answered the phone.  

            The following morning, at
approximately 6 a.m., Crystal and Sarahi’s mother, Maria Nesbitt, woke up Crystal
because Sarahi had not come home. 
Crystal and Maria called Sarahi’s friends, including Jorge, to find out
if anyone knew where she was, but no one had seen her.  Around 9 a.m., Crystal, Maria, and Sarahi’s
friend, Brenda, went to find Appellant’s house and look for Sarahi there.  Crystal and Maria did not know where
Appellant lived but Brenda remembered the street he lived on because she and
Sarahi had driven by the house once while on the way to the store.  Once they were on the street, Maria, Crystal,
and Brenda found the house because they recognized Appellant’s car in the
driveway.  They rang the doorbell and
knocked on Appellant’s door and windows, but no one answered.  They continued knocking and ringing the
doorbell for about thirty minutes before they gave up and left.  Crystal and Maria returned home to wait for
Sarahi.  When Sarahi hadn’t arrived home by
12 p.m., Crystal and her mother returned to Appellant’s house.  Once again, they rang the doorbell and
knocked on the windows.  Crystal became
increasingly worried that her sister was in the house so she hopped a fence
into the back yard and started looking in the windows.  Crystal saw Appellant and Sarahi sitting on
the floor outside of the bathroom. 
Crystal testified that her sister was moving her arms up and down and it
looked like she and Appellant were arguing. 
She could not hear the conversation, but Sarahi appeared to be scared
and was screaming at Appellant.  Appellant
was saying “No” and getting in Sarahi’s face. 
Crystal knocked on the window to let them know she was there.  When Sarahi looked up and saw Crystal, she
appeared to be surprised and Crystal saw fear in her sister’s eyes.  At that point, Crystal ran back to her mother
and told her to call the police.  From
the front door, Crystal could hear her sister screaming and crying from inside
the home.  It sounded as though Sarahi
was running through the house and Crystal could hear Sarahi screaming, “No,
Roberto, no.”  Crystal began trying to
break into the house and she discovered a front window which was partially
open.  She removed the screen and ran into
the house.  

Once inside, Crystal grabbed a beer bottle off the coffee table and she
could hear Sarahi screaming her name from upstairs.  With the beer bottle in hand, Crystal ran
upstairs toward the sound of Sarahi’s voice. 
She noticed one room with the door shut, so she opened it and went inside.  Crystal saw her sister sitting on a bed,
covered in blood and Appellant was standing beside her.  Appellant was holding Sarahi by the hair with
his left hand and he had a knife in his right hand.  Crystal saw cuts on Sarahi’s chest so she
tried to move closer to help her.  As
Crystal approached, Appellant swung the knife at Crystal and cut her.  Sarahi tried to stop Appellant by pulling on
the back of his shirt and saying, “No Roberto, not to my sister.”  Crystal asked Appellant why he had done that
to Sarahi, and he responded by saying that he was going to let her go but he
got scared when they showed up at the house. 


            The police arrived at the house and
were met by Maria, who they described as frantic, hysterical, and screaming.  They heard someone screaming inside of the
house so they entered and ran upstairs. 
They saw a young woman covered in blood on a bed and a second female
also on the bed.  Appellant was standing
near them with a knife clenched in his hand. 
They identified themselves as police officers and ordered Appellant to
drop the knife.  Appellant dropped the
knife but resisted the officers’ efforts to handcuff him.  After they handcuffed him and removed him
from the room, Office Ricardo Huante observed that Sarahi was bleeding
profusely from stab wounds to her chest and umbilical area.  Huante attempted to aid Sarahi until EMS
arrived by putting pressure on her wounds. 
She told him several times that she was dying.  In an effort to keep her conscious, Huante
asked Sarahi what had happened.  Sarahi
told him that she had gone voluntarily with Appellant but when she wanted to
leave, he refused to let her go.  When
her mother arrived, Appellant refused to let Sarahi leave and he became angry
and began to stab her.  Huante maintained
pressure on the wounds until EMS arrived. 
EMS transported Sarahi to the hospital where she underwent immediate
surgery to insert chest tubes and to treat the stab wounds to her neck,
abdomen, chest, back, right shoulder, right arm, and hand.  After the surgery was completed, there
continued to be active bleeding in the left chest cavity and Sarahi suffered
cardiac arrest.  She was resuscitated and
returned to surgery where it was determined that the left lung and the
posterior chest wall stab wound were bleeding. 
The surgeon sutured the lung and stab wound and added two more chest
tubes to the left side of Sarahi’s chest. 
The following day, Sarahi went into a coma as the result of hypovolemic
shock.  She was declared dead the
following day.  

            The
medical examiner’s office performed the autopsy.  Dr. Juan Contin did not perform the autopsy,
but he reviewed the medical records and autopsy report and offered his expert
medical opinion that the victim bled to death as a result of multiple stab
wounds.  Dr. Contin also reviewed a peer
review report which evaluated the medical treatment of Sarahi Hernandez.  The peer review determined that the hospital
could have prevented the death of the victim by appreciating the significance
of the blood loss through the chest tube. 


            Jessica
Gausin and her boyfriend, Luis Martinez, testified for the defense.  On June 14, 2008, Gausin and Martinez went to
Appellant’s house.  Gausin recalled that
they went to his house at approximately 11:30 p.m. but Martinez testified that
it was 9 p.m.  Appellant left the house
after receiving a phone call and he returned with Sarahi who was crying.  Martinez testified that Sarahi was dating
Appellant.  Gausin and Martinez left at
around 3 a.m. and Sarahi remained at the house. 
Neither of them saw Sarahi being held against her will. 

            Dr.
Leann Grossberg, an expert in forensic pathology, reviewed the autopsy report,
the police reports, and the medical records. 
The record of admission showed decreased breath sounds on her right
side, insertion of a right-chest tube, and normal breath sounds on her left
side.  Dr. Grossman did not find any
evidence of a pneumothorax in the left chest cavity.  In her expert opinion, she did not see any
clinical indication to put a chest tube in the left chest cavity.  Sarahi had nine stab wounds but six of them
were into tissue and did not cut any major blood vessels.  The stab wound to the abdomen was potentially
fatal but Sarahi had received prompt medical attention and the bleeding from
that wound had been stopped.  If the
bleeding from that wound had not been stopped, it would have been fatal.  Dr. Grossberg questioned whether the bleeding
in the left chest cavity had been caused by the stab wound to the left side of
Sarahi’s back or by the placement of the left chest tube.  Based on her review of the post-operative
chest x-ray, Dr. Grossberg could not rule out the stab wound to the back as the
cause of the bleeding but she felt that it was unlikely.  She admitted that death from improper
placement of a chest tube is rare.  Dr.
Grossberg also testified that Sarahi would have died as the result of bleeding
from the stab wounds if she had not gotten medical treatment.  

            The
jury rejected Appellant’s defense and found him guilty of causing the death of
Sarahi Hernandez by stabbing her with a knife while in the course of committing
or attempting to commit the offense of kidnapping.  The jury also found him guilty of aggravated
assault by causing bodily injury to Crystal Nesbitt by cutting her with a
knife.  

ADMISSION OF DYING DECLARATION

            In Issue One, Appellant argues that
the trial court erred in admitting Officer Huante’s testimony regarding
statements Sarahi made to him because it violated his right to confrontation
guaranteed by the Sixth Amendment.  The
State makes several arguments in response including that Appellant waived his
right to confrontation by wrongdoing, Sarahi’s statements were non-testimonial,
and the statements were admissible as a dying declaration.  It is unnecessary to address the State’s
assertions that Sarahi’s statements are non-testimonial or that the forfeiture
by wrongdoing exception applies in this case because we conclude that the trial
court properly admitted the statements as a dying declaration which is an
exception to the right of confrontation.

            Generally, a trial court’s decision
to admit evidence is reviewed for an abuse of discretion.  Prible
v. State, 175 S.W.3d 724, 731 (Tex.Crim.App. 2005).  Whether an out-of-court statement is
admissible as an exception to the hearsay rule is a matter within the trial
court’s discretion.  Zuliani v. State, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003).  The trial court abuses its discretion if the
decision lies outside of the zone of reasonable disagreement.  Id.  An appellate court engages in a de novo review when determining whether
the admission of a declarant’s out-of-court statements violate the
Confrontation Clause.  Lilly v. Virginia, 527 U.S. 116, 136-37,
119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999); Langham v. State, 305 S.W.3d 568, 576 (Tex.Crim.App. 2010)(stating
that whether a particular out-of-court statement is testimonial or not is a
question of law which must be reviewed de
novo).  

            The Sixth Amendment provides that “[i]n
all criminal prosecutions, the accused shall enjoy the right . . . to be
confronted with the witnesses against him.”  U.S.
Const. Amend. VI; Giles v.
California, 554 U.S. 353, 357-58, 128 S.Ct. 2678, 2682, 171 L.Ed.2d 488
(2008).  The central purpose of the
Confrontation Clause is to ensure the reliability of the evidence against an
accused by subjecting it to rigorous testing in an adversary proceeding before
the trier of fact.  Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111
L.Ed.2d 666 (1990).  The Confrontation
Clause contemplates that a witness who makes testimonial statements admitted
against a defendant will ordinarily be present at trial for cross-examination.  Giles,
554 U.S. at 358, 128 S.Ct. at 2682.  If
the witness is unavailable, his prior testimony will be introduced only if the
defendant had a prior opportunity to cross-examine him.  Giles,
554 U.S. at 358, 128 S.Ct. at 2682.  The
United States Supreme Court held in Crawford
v. Washington that the Confrontation Clause is most naturally read as a
reference to the right of confrontation at common law, admitting only those
exceptions established at the time of the Founding.  Crawford
v. Washington, 541 U.S. 36, 54, 124 S.Ct. 1354, 1365-66, 158 L.Ed.2d 177
(2004).  There are two common-law
exceptions to the right of confrontation. 
Giles, 554 U.S. at 358, 128
S.Ct. at 2682-83.  The first is a dying
declaration, where the declarant makes a statement while on the verge of death.  Id.,
554 U.S. at 358, 128 S.Ct. at 2683.  The
second is forfeiture by wrongdoing, which allows the admission of statements of
a witness who was detained or kept away by the means or procurement of the
defendant.  Id., 554 U.S. at 358-59, 128 S.Ct. at 2683.  The United States Supreme Court held in Giles that the forfeiture by wrongdoing exception
applies only if the defendant engaged in the wrongdoing with the intent to
prevent the witness from testifying.  See id., 554 U.S. at 361-62, 128 S.Ct.
at 2684.  

Sarahi’s
statements made to Officer Huante were admitted as a dying declaration.  A dying declaration is a “statement made by a
declarant while believing that the declarant’s death was imminent, concerning
the cause or circumstances of what the declarant believed to be impending
death.”  Tex.R.Evid. 804(b)(2). 
This hearsay exception has been accepted under common-law tradition
since before the drafting of the American Constitution.  Gardner
v. State, 306 S.W.3d 274, 290 (Tex.Crim.App. 2010).  To satisfy the dying declaration exception, the
victim’s sense of impending death may be established in a number of ways,
including her express words, her conduct, the severity of her wounds, the
opinions of others stated to her, or any other relevant circumstances.  Gardner,
306 S.W.3d at 292.  Sarahi was bleeding
profusely from the stab wounds and she told Officer Huante several times that
she was dying.  Huante believed, based on
Sarahi’s condition, that she was going into shock and her death was imminent if
she did not receive medical care.  The
record supports the trial court’s conclusion that Sarahi believed her death was
imminent at the time she made the statements. 
See Gardner, 306 S.W.3d at
292.  

Sarahi
told Huante that she had gone voluntarily with Appellant but when she wanted to
leave he refused to let her go.  She also
said that when her mother arrived and wanted her to leave, Appellant refused to
let her leave the residence and he became angry and began to stab her.  The trial court did not abuse its discretion
by concluding that Sarahi’s statements concerned not only the cause but also the
circumstances of what she believed to be impending death.  Assuming for the sake of argument that Sarahi’s
statements were testimonial, we conclude that the admission of this dying
declaration did not violate Appellant’s right to confrontation under the Sixth
Amendment.  See Giles, 554 U.S. at 358-59, 128 S.Ct. at 2682-83; Crawford v. Washington, 541 U.S 36, 56
n.6, 124 S.Ct. 1354, 1367 n.6, 158 L.Ed.2d 177 (2004); Gardner, 306 S.W.3d at 288-89. 
Issue One is overruled.

JURY CHARGE ERROR

            In Issue Two, Appellant complains that
the trial court erred by failing to apply the law of concurrent causation to
the facts of the case.  Appellant
introduced evidence at trial that the medical treatment provided to the victim
may have contributed to her death and he argues on appeal that she died as the
result of medical malpractice.  The State
responds that Appellant was not entitled to an instruction on concurrent
causation because the evidence does not raise an issue that a concurrent cause
was clearly sufficient to have caused the victim’s death.

Standard
of Review

            In reviewing charge error, we must
first determine whether error exists.  Druery v. State, 225 S.W.3d 491, 504
(Tex.Crim.App. 2007).  If we find error,
we must then determine whether the error caused sufficient harm to require
reversal.  Id.  The standard of review
differs depending on whether the defendant made a timely objection at trial.  See
Bluitt v. State, 137 S.W.3d 51, 53 (Tex.Crim.App. 2004).  If the error was the subject of a timely
objection, reversal is required if there is some harm to the defendant as a
result of the error.  See Tex.Code
Crim.Proc.Ann. art. 36.19 (West 2006); Ovalle v. State, 13 S.W.3d 774, 786 (Tex.Crim.App. 2000); Almanza v. State, 686 S.W.2d 157, 171
(Tex.Crim.App. 1985)(op. on reh’g).  If
no proper objection was made at trial, reversal is required only if the error
is so egregious that the defendant was denied a fair and impartial trial.  See
Ovalle, 13 S.W.3d at 786; Almanza,
686 S.W.2d at 171.  Errors that result in
egregious harm are those that affect the very basis of the case, deprive the
defendant of a valuable right, or vitally affect a defensive theory.  See
Almanza, 686 S.W.2d at 172.  The
degree of harm is determined in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of probative evidence,
the argument of counsel and any other relevant information revealed by the
record of the trial as a whole.  See Almanza, 686 S.W.2d at 171.

Analysis


            The jury charge included the following abstract instruction
on causation: 

A person is criminally responsible if the result would
not have occurred but for his conduct, operating either alone or concurrently
with another cause, unless the concurrent cause was clearly sufficient to
produce the result and the conduct of the actor clearly insufficient.

 

This paragraph tracks the language in
Section 6.04(a) of the Penal Code.  Tex.Penal Code Ann. § 6.04(a)(West 2011).[1]  Section 6.04(a) requires the State to
establish a “but for” causal connection between the defendant’s conduct and the
resulting harm.  Robbins v. State, 717 S.W.2d 348, 351 (Tex.Crim.App. 1986).

            The
charge included only a general application paragraph for the offense of capital
murder, stating: 

Now, if you find from the evidence beyond a
reasonable doubt that on or about the 15th day of June, 2008, in El Paso
County, Texas, the defendant, ROBERTO VALDEZ, did then and there intentionally
cause the death of an individual, namely ANA SARAHI HERNANDEZ by stabbing ANA
SARAHI HERNANDEZ about the body with a knife, and the defendant, ROBERTO
VALDEZ, was then and there in the course of committing and attempting to commit
the offense of Kidnapping of ANA SARAHI HERNANDEZ, then you will find the
defendant, ROBERTO VALDEZ, GUILTY OF CAPITAL MURDER, as alleged in Count I of the
indictment.  (Verdict Form ‘A’). 

 

Unless you so find beyond a reasonable doubt,
or if you have a reasonable doubt thereof, you will acquit the defendant,
ROBERTO VALDEZ, of CAPITAL MURDER and next consider if the defendant is GUILTY
of MURDER.

 

Appellant did not object to
the trial court’s failure to address concurrent causation in the application
paragraph.

            An accused is entitled to a charge on every defensive
issue raised by the evidence, regardless of whether it is strong, feeble,
unimpeached, or contradicted.  Muniz v. State, 851 S.W.2d 238, 254
(Tex.Crim.App. 1993).  Conversely, the
defendant is not entitled to an instruction that is not raised by the evidence.
 Remsburg
v. State, 219 S.W.3d 541, 545 (Tex.App.--Texarkana 2007, pet. ref’d).  To raise an issue of concurrent causation
under Section 6.04(a), there must be evidence that:  (1) the defendant’s actions were clearly
insufficient to produce the result; and (2) a concurrent cause was clearly
sufficient to produce the result.  Tex.Penal Code Ann. § 6.04(a); Remsburg, 219 S.W.3d at 545; Hutcheson v. State, 899 S.W.2d 39, 42
(Tex.App.--Amarillo 1995, pet. ref’d).   

            There is no evidence that Appellant’s
actions were clearly insufficient to cause the victim’s death.  To the contrary, both Dr. Contin and
Appellant’s expert, Dr. Grossberg, testified that Sarahi bled to death as the
result of multiple stab wounds.  While
Dr. Grossberg questioned whether placement of the left chest tube might have
caused an injury to the left lung and resultant bleeding, she did not testify
that the stab wounds were clearly insufficient to cause Sarahi’s death.  In the absence of such evidence, Appellant
was not entitled to any instruction on concurrent causation.  Issue Two is overruled.




 

LEGAL SUFFICIENCY

            In his third issue, Appellant argues
that the evidence was legally insufficient to prove that he intentionally or
knowingly kidnapped, or attempted to kidnap Sarahi Hernandez.[2]

Standard
of Review

            The legal sufficiency standard
articulated in Jackson v. Virginia,
443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is the only standard a
reviewing court applies in determining whether the evidence is sufficient to
support a conviction.  Brooks v. State, 323 S.W.3d 893, 894-95
(Tex.Crim.App. 2010).  Under the Jackson standard, a reviewing court must
consider all evidence in the light most favorable to the verdict and in doing
so determine whether a rational justification exists for the jury’s finding of
guilt beyond a reasonable doubt.  Brooks, 323 S.W.3d at 894-95, citing Jackson, 443 U.S. at 319, 99
S.Ct. at 2789.  As the trier of fact, the
jury is the sole judge as to the weight and credibility of witness testimony,
and therefore, on appeal we must give deference to the jury’s
determinations.  Brooks, 323 S.W.3d at 894-95. 
If the record contains conflicting inferences, we must presume the jury
resolved such facts in favor of the verdict and defer to that resolution.  Id.  On appeal, we serve only to ensure the jury
reached a rational verdict.  We may not
reevaluate the weight and credibility of the evidence produced at trial and in
so doing substitute our judgment for that of the fact finder.  King v.
State, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000).  In our review, we consider both direct and
circumstantial evidence and all reasonable inferences that may be drawn from
the evidence. Hooper v. State, 214
S.W.3d 9, 13 (Tex.Crim.App. 2007).  The
standard of review as to the sufficiency of the evidence is the same for both
direct and circumstantial evidence cases.  Id.;
Arzaga v. State, 86 S.W.3d 767, 777
(Tex.App.--El Paso 2002, no pet.).  Each
fact need not point directly and independently to the guilt of the accused, so
long as the cumulative force of all the evidence, when coupled with reasonable
inferences to be drawn from that evidence, is sufficient to support the
conviction.  Id.

Applicable Law

            Count I of the indictment charged
Appellant with capital murder.  It
alleged that he intentionally caused the death of Sarahi Hernandez by stabbing
her with a knife while “in the course of committing and attempting to commit the
offense of kidnapping.”  A person commits
capital murder if he intentionally or knowingly causes the death of an
individual while in the course of committing or attempting to commit
kidnapping.  Tex.Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(2)(West 2011).  The State is not required to prove that
Appellant completed a kidnapping because a person can be guilty of capital
murder if the State can show the murder occurred during an attempt to commit
kidnapping.  Tex.Penal Code Ann. § 19.03(a)(2).  Criminal attempt requires both the commission
of an act that amounts to more than mere preparation and a specific intent to
commit the offense.  Tex.Penal Code Ann. § 15.01 (West 2011).

A person commits the offense of kidnapping when he “intentionally or
knowingly abducts another person.”  Tex.Penal Code Ann. § 20.03(a).  “Abduct” is defined as restraining “a person
with intent to prevent his liberation by: (A) secreting or holding him in a
place where he is not likely to be found; or (B) using or threatening to use
deadly force.”  Id. at § 20.01(2).  “Restrain”
is defined as restricting “a person’s movements without consent, so as to
interfere substantially with the person’s liberty, by moving the person from
one place to another or by confining the person.”  Id.
at § 20.01(1).  Restraint is without
consent if it is accomplished by force, intimidation, or deception.  Id.
at § 20.01(1)(A).  There is no specific
time requirement for determining whether a person has been restrained.  Hines v.
State, 75 S.W.3d 444, 447-48 (Tex.Crim.App. 2002).  It is up to the jury to distinguish between
those situations in which a substantial interference with the victim’s liberty
has taken place and those situations in which a slight interference has taken
place.  Id. at 448.  The offense of
kidnapping is legally completed when the defendant, at any time during the
restraint, forms the intent to prevent liberation by secreting or holding
another in a place unlikely to be found or by using or threatening to use force.  Laster
v. State, 275 S.W.3d 512, 521 (Tex.Crim.App. 2009); Clark v. State, 24 S.W.3d 473, 476 (Tex.App.--Texarkana 2000, no
pet.). 

To show that Appellant kidnapped or attempted to kidnap Sarahi Hernandez,
the State had the burden of proving that: 
(1) Appellant restrained Sarahi or accomplished more than mere
preparation for restraint; (2) the restraint was without Sarahi’s consent; and
(3) Appellant acted with the specific intent to prevent Sarahi’s liberation by
either secreting her in a place where she was unlikely to be found or by using
or threatening to use deadly force to restrain her.  See Tex.Penal Code Ann. §§ 20.01(1), (2),
20.03(a); Saldana v. State, 59 S.W.3d
703, 708 (Tex.App.--Austin 2001, pet. ref’d).

Evidence of Restraint

Appellant first argues that there
is no evidence of restraint other than Sarahi’s dying declaration which he
refers to as inadmissible.  Even if we
had sustained Appellant’s challenge to the admissibility of this evidence in
Issue One, we are required to consider all of the evidence, including
inadmissible evidence, in our sufficiency review.  See
Russeau v. State, 171 S.W.3d 871, 879 n.2 (Tex.Crim.App. 2005).  Appellant also focuses on the evidence that
Sarahi was voluntarily at his house and no one saw her being restrained.  The fact that Sarahi initially accompanied
Appellant voluntarily to his house does not preclude the possibility that
kidnapping subsequently occurred.  See Rodriguez v. State, 730 S.W.2d 75,
79 (Tex.App.--Corpus Christi 1987, no pet.). 
Likewise, Appellant’s friends did not observe Sarahi being held against
her will at 3 a.m. when they left Appellant’s house, but that does not
foreclose the possibility that the restraint on her liberty occurred after
Gausin and Martinez left.  In fact, Jorge
Cardenas spoke with Sarahi at around 3 a.m. and he understood that Appellant
was going to drive Sarahi back to Jorge’s house and drop her off, but she never
arrived.  Sarahi told Office Huante that
she wanted to leave but Appellant would not let her go.  Similarly, Appellant told Crystal that he was
going to let Sarahi leave until she and her mother arrived at the house.  This supports two inferences.  First, Appellant’s statement that he was
going to let Sarahi leave indicates that it was his decision whether and when
she could leave.  Second, the jury could
have found that Appellant refused to let Sarahi leave after her mother and
sister arrived at his house.  We conclude
that a rational trier of fact could find beyond a reasonable doubt Appellant
restricted Sarahi’s movements and substantially interfered with her liberty by
confining her to his home.  

Lack of Consent

There is also legally sufficient evidence that the restraint was without
Sarahi’s consent.  Sarahi told Officer
Huante that she wanted to leave but Appellant would not let her go.  When Crystal looked through the window and
saw Appellant telling Sarahi “no” while “getting in her face,” she knocked on
the window to let them know she was there. 
At that moment, she saw fear in Sarahi’s eyes.  Crystal ran to tell her mother to call the
police and she heard Sarahi running through the house and screaming, “No,
Roberto, no.”  Sarahi had stab wounds to the
left side of her back and the back of one of her legs.  One inference from this evidence is that
Appellant stabbed Sarahi while she was fleeing from him and trying to leave the
house with her family.  Further, when
Crystal went into the bedroom upstairs, she saw Appellant holding Sarahi by the
hair with one hand and the knife in the other hand.  The jury could have reasonably concluded
beyond a reasonable doubt that Appellant restrained Sarahi without her consent
through force and intimidation.  See Megas v. State, 68 S.W.3d 234, 239
(Tex.App.--Houston [1st Dist.] 2002, pet. ref’d)(holding evidence legally
sufficient to prove victim was restrained against her will where the defendant
assaulted the victim to prevent her from leaving his car).

Specific Intent to Prevent Liberation

Finally, we consider whether Appellant acted with the specific intent to
prevent Sarahi’s liberation by either secreting her in a place where she was
unlikely to be found or by using or threatening to use deadly force to restrain
her.  There is evidence that neither
Maria nor Crystal knew where Appellant lived. 
Fortunately, Jorge knew that Sarahi had been with Appellant when he last
spoke with her, and Sarahi’s friend, Brenda, knew the street where Appellant
lived.  They were able to find his house
only because they recognized his car parked in the driveway.  When they went to the door and knocked
repeatedly at 9 a.m. and noon, Appellant did not answer the door.  This is some evidence that Appellant intended
to restrain Sarahi by secreting her in a place where she was unlikely to be
found.  See Laster, 275 S.W.3d at 522.

Additionally, there is evidence that Appellant intended to prevent Sarahi’s
liberation by using or threatening to use deadly force to restrain her.  Immediately after Crystal knocked on the
window and told her mother to call the police, Sarahi began running through the
house while screaming “No, Roberto, no.” 
Appellant stabbed Sarahi nine times before Crystal could enter the
house.  When Crystal entered the bedroom,
she saw that Appellant was holding Sarahi by the hair with one hand while
holding a knife in the other hand. 
Crystal tried to go to her sister’s aid, but Appellant slashed the knife
at Crystal and cut her.  Appellant
dropped the knife only when police officers entered the room and commanded him
to do so.  From this evidence, the jury
could have rationally concluded beyond a reasonable doubt that Appellant acted
with the specific intent to prevent Sarahi’s liberation by using and
threatening to use deadly force to restrain her.  Issue Three is overruled.  Having overruled all three issues presented
on appeal, we affirm the judgments of conviction related to Counts I and II. 

 

October 17, 2012                                _______________________________________________

ANN CRAWFORD
McCLURE, Chief Justice

 

Before McClure, C.J., Rivera, and Antcliff, JJ.

 

(Do Not Publish)











[1]  Section 6.04(a) of the Texas Penal Codes
states:  “[a] person is criminally
responsible if the result would not have occurred but for his conduct,
operating either alone or concurrently with another cause, unless the
concurrent cause was clearly sufficient to produce the result and the conduct
of the actor clearly insufficient.”  Tex.Penal Code Ann. 6.04(a). 





[2]  Appellant challenges only the legal
sufficiency of the evidence to prove kidnapping; he does not challenge the
sufficiency of the evidence to prove he murdered Sarahi by stabbing her with a
knife.